# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SARAH BURNS McINTOSH, LOUIS CHARLES McINTOSH,<br><br>   Plaintiffs,<br>   v.<br><br>UNITED STATES OF AMERICA, CEDRIC LAMONT TATE<br><br>   Defendants. | CASE NO. 05cv373 BTM(JMA)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On June 16 -19 and July 8, 2008, the Court held a bench trial on Plaintiffs' claims against the United States of America. The Court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

This case arises out of the brutal attack and attempted rape of Sarah McIntosh by Cedric Lamont Tate at Fiddler's Cove Marina on August 4, 2001.

A. <u>Background and Marina Lay-Out</u>

The Fiddler's Cove Marina ("Fiddler's Cove" or "Marina") is located in Coronado, California. The Marina is operated by the U.S. Department of the Navy for the morale,

welfare, and recreation of Navy service members (active, retired, or reserve) and their guests. Facilities include about 226 slips, docks, an RV park with camp sites, a picnic area, restrooms, and a store. Service members can rent slips pursuant to written lease agreements with the Navy, and some service members are granted permission to live aboard their vessels.

From 1994 until early 2002, Plaintiff Charles McIntosh, a retired Navy Seal, along with his wife Pam, daughter Sarah, and two sons lived aboard the "Sarah Vida," a forty-foot sailing vessel that was moored at Fiddler's Cove. Mr. McIntosh entered into written lease agreements with the Navy.

The Marina is on land that is owned by the City of Coronado and leased by the Navy. The Marina is bordered by Navy housing to the south, the San Diego Bay to the east, a bicycle path and the Silver Strand Highway (Highway 75) to the west, and an open unused area to the north.

The main entrance to the Marina is accessed from the Silver Strand Highway. In 2001, vehicles entered the property through a sliding wrought iron gate. A sign on the gate read: "Warning. U.S. Government Property. Parking restricted to authorized personnel only. Violators will be towed at owner's expense. By order of the commanding officer." When operable, the gate was opened by pushing a button on what looked like a speaker box. No code or access key was needed. A chain-link pedestrian gate was located on the right side of the vehicle entrance (looking into the Marina). There was a push-button lock on the pedestrian gate.

Adjacent to the vehicle entrance and pedestrian gate was a seven to eight-foot high chain-link fence that bordered the side of the Marina running along the Silver Strand Highway. There was a five-foot high fence between the Marina and the Navy housing to the south. On August 4, 2001, and at other times, there was a hole in the fence between the Marina and Navy housing. There was testimony that the holes were probably made by children in Navy housing who wanted access to the Marina's soda machines. There was an access road between the Marina parking lot and the Navy housing area that ended at an

elementary school.  The Marina could also be accessed by water.

There was a public parking lot on the north side of the vehicle gate.  (Trial Exhibit ("Tr. Ex.") 29.)  On the south side of the vehicle gate there was parking for Marina residents and visitors ("Marina parking lot").  (Tr. Ex. 27.)  Between the vehicle gate and the Marina parking lot was a small grassy area.  (Tr. Ex. 27A.)  To the east of the Marina parking lot was a ramp to the docks where the live-aboard vessels were moored.  At the bottom of the ramp was a gate to the dock area.  The gate was secured by a simplex push-button combination lock.

B.  <u>The Attack</u>

On August 3, 2001, Sarah was seventeen and had recently graduated from high school. That night, Sarah was at a friend's house in Coronado.  Around 3:00 a.m. on August 4, Sarah left her friend's house and drove home to the Marina.  She drove through the vehicle gate, which was inoperable and left in the open position, and parked her car in the Marina parking lot.

After she parked her car, she noticed a man, later identified as Cedric Lamont Tate, in the parking lot.  Sarah exited the car and started walking toward the ramp that led down to her family's boat.  Tate followed Sarah.  When Sarah was close to the ramp, in front of a garage door of a Marina building, Tate asked Sarah what time it was.  Sarah turned around slightly, and mumbled the time.  At that time, Tate, a 6'1" muscular man, grabbed Sarah around her neck from behind.  Sarah made her body limp and started screaming.  Tate dragged her into the grassy area between the Marina parking lot and the vehicle gate and threw her on the ground.  Tate beat Sarah about her face with his fists and threatened to kill Sarah if she did not stop screaming.  Sarah continued to scream and struggled as hard as she could, putting up a valiant fight as her father had taught her to do.  Tate managed to pull off Sarah's jeans and underwear.  Fortunately, Tate's attack was interrupted when Sarah's screams caught the attention of two RV residents who came running over.  When Tate saw the two men, he ran out of the front gate.

The Navy police and Coronado police responded to the incident, and Sarah was taken by ambulance to Balboa Naval Medical Center. Sarah's face was swollen and bruised and her left cheekbone was fractured. She also had a hematoma under her skin which lingered for a couple of months. After the attack, Sarah, who had been outgoing, spent most of her time on the family boat. She did not go back to work at the ice cream shop where she previously worked, and was afraid to go anywhere by herself. Although Sarah's physical injuries healed within months, the attack has had lasting emotional and psychological effects. Sarah appears to be a well-adjusted young woman, but she understandably still has anxious feelings about bad things happening to her or her child and is a bit "compulsive" about safety. Sarah attended one free counseling session after the attack but did not seek or receive any other psychological treatment.

At the time of the attack, Tate was a Navy Seal trainee stationed at the Naval Amphibious Base in Coronado. According to Tate, prior to attacking Sarah, he was drinking in a bar at Imperial Beach. He got into an argument with the bar owner and left the bar, walking north along the Silver Strand Highway. Tate stated that when he was close to the Marina, he noticed that the vehicle gate was open. He saw Sarah's vehicle go through the gate and followed "right behind her" on foot through the gate. Although Tate claimed that he intended to "rob" Sarah, the Court does not believe Tate. Considering what happened to Sarah and Tate's subsequent criminal activity, it is obvious that Tate intended to sexually assault Sarah.

Tate claimed that he was motivated to follow Sarah because the gate was open, there was no security, and Sarah was there. Tate seized the opportunity to attack a woman who was alone. According to Tate, the public parking lot outside of the gate was not lit up. There was some lighting around the gate, enough for Tate to see Sarah and her car. Tate testified that other than the public parking lot, "everything else was pretty much – it was lit, and I could see, you know."

Tate said that "without a shadow of a doubt that had that gate not been opened, I would not have followed her." Tate explained that if the gate had closed immediately behind

Sarah, he would not have had any interest in climbing over the gate. He also said that he did not have any interest in seeking another way to get into the Marina to attack her.

According to Tate, he chose his victims at random. "It's very clear. I saw them there. Whoever was available, I didn't care. I just attacked. I just didn't care. I wanted to fight. . . . When I get drunk, I get violent."

Within an hour or so of attacking Sarah, Tate raped a woman at the Hotel Del Coronado parking lot. Tate attacked yet another woman the following day.

Eventually, Tate was charged with the assault, attempted rape, and kidnapping for rape of Sarah, the forcible rape and rape by foreign object of another woman (Bertha A.) that same day (August 4, 2001), and the assault, kidnapping for rape, and attempted murder of yet another woman (Iris D.) on August 5, 2001. (Tr. Ex. LL.) Tate entered a plea of guilty to the following charges: the kidnapping for rape and attempted rape of Sarah, the forcible rape of Bertha A., and the attempted murder without premeditation of Iris D. (Tr. Ex. KK.) Tate is currently serving his sentence at Kern Valley Prison.

C. Gates & Lighting

It is undisputed that on the night of Sarah's attack, the vehicle gate was inoperable and left in the open position. During 2001, the vehicle gate was frequently broken and left in the open position. According to Brandon Workman, who became Assistant Manager of the Marina shortly after the attack, the vehicle gate was broken once every six weeks on average. Mr. McIntosh estimated that the vehicle gate was broken twice a month, and Mrs. McIntosh states that it was broken more often than it was functioning. Although it is unclear exactly how often the gate was broken, the Court finds that it was a common occurrence.

Although Marina management could sometimes fix the gate themselves, many repairs had to be done by the vendor, in which case it could take a week or more for the gate to be repaired. Repair of the gate was classified as a high priority. The Court finds that, as testified by Marina tenant Geoffrey Calabrese, the gate was fixed within a reasonable amount of time when it was broken. However, the gate would soon be broken again. According to

Workman, whatever was wrong with the gate on August 4, 2001 needed to be repaired by the vendor.

On the night of Sarah's attack, the pedestrian gate was off its hinges and was missing as depicted in Trial Exhibit 32. There were times in 2001 when the pedestrian gate was in this condition.

There were no lights on the north side of the vehicle gate or in the public parking lot. There were yellow street lights in the Marina parking lot to the south of the gate. As testified by Officer Keith James and Cedric Tate himself, this parking lot was well illuminated. There was also lighting on the side of the Marina building where Tate first grabbed Sarah. There was also a street light immediately inside the vehicle gate. (Tr. Ex. 29.) However, on the night of Sarah's attack, this light was out. As a result, the grassy area where Tate dragged Sarah was not as well-illuminated as it would otherwise have been.

The Court does not rely on Trial Exhibits 63-84, the pictures taken by Officer James, as accurate depictions of the lighting at the time of the attack. Although Officer James testified that the photographs accurately depict the lighting conditions at the time of the attack, the Court does not believe that Officer James remembers today exactly what the lighting conditions were on August 4, 2001. James does not remember what camera he used or what exposure he used. Furthermore, James used the flash on the camera. Therefore Plaintiff has not established that the photographs are accurate depictions of the lighting conditions at the time of the attack. The Court need not and does not rely on the expert testimony of James Harris, the Government's expert on visibility.

It is unclear how long the light inside the vehicle gate had been out prior to August 4, 2001. The light was repaired within two weeks of the attack on Sarah. Workman explained that the street lights were high voltage lights that were repaired by Navy Public Works personnel. Although there was testimony that the lights in the common areas would frequently go out, the evidence does not establish that the Navy took an unreasonable amount of time to perform the repairs.

D. Prior Criminal Incidents & Complaints

Mr. McIntosh recalls that in 1983, he learned from media coverage and talk in the Marina that two Japanese exchange students had been raped and shot on the east side of the Silver Strand Highway, about a quarter or a half mile from Fiddler's Cove. There is no evidence that Marina management was aware of this incident.

There is no evidence that any assaults, attempted rapes or rapes, or other violent crimes were committed in the Marina by non-residents prior to Sarah's attack. (There apparently was an assault incident between two Marina residents.) In addition, there is no evidence that anyone complained to Marina management regarding personal safety concerns.

In 1991, retired Commander Charles King, a live-aboard resident at the time, wrote a letter about various things that could be improved at the Marina. (Tr. Ex. 4.) Although the letter made suggestions regarding how to improve security, it did not indicate that the suggestions were in response to any threat to personal safety. Indeed, Mr. King testified that other than Sarah's attack he was not aware of any batteries or assaults in the Marina by outsiders.

In the late 1990's there were thefts that took place in the Marina. Property reported stolen included motorcycles, bicycles, an anchor, Mr. King's dinghy, and electronic equipment from boats and cars. Mr. McIntosh and other attendees of patron meetings between the Marina residents and Marina management raised concerns regarding the lack of protection for their property. However, no complaints were made regarding personal safety.

The thefts took place during a time when the front vehicle gate was a key-card accessed gate. This gate was, for the most part, inoperable and left in the open position. In 1999 or 2000, a push-button sliding vehicle gate was installed. This was the gate that was in place on August 4, 2001. The dock gate and some security cameras were also installed around this time.

Generally, Marina residents would bring it to the attention of Marina management

when lights in the common areas were out. Marina residents would also tell Marina management when the gate was not working.

E. <u>Lease and Claimed Contractual Damages</u>

On June 1, 2000, Mr. McIntosh and the Commander, Navy Region, Southwest Morale Welfare & Recreation, entered into a "Regional Marina Berthing/Mooring/Storage Agreement" ("Lease Agreement"), whereby the Navy granted Mr. McIntosh permission to moor his boat at the Marina. (Tr. Ex. 18.) The monthly rent was $200.

Mr. McIntosh agreed that he and his guests would "strictly follow the terms and conditions of this Agreement and the Rules and Regulations of the Marina." (Lease Agreement ¶ 8.) Section IV.2 of the Rules and Regulations of the Marina provides:

> The Lessee, not the Lessor, is responsible for the security and safety of his/her own vessel and appurtenances. Additionally, the Lessee, not the Lessor, is responsible for his/her own personal safety as well as that of his/her guest(s). The only security provided by Lessor is for the protection of Marina property.

(Tr. Ex. 22.) There is no explicit provision in the Lease Agreement or the Rules and Regulations whereby the Navy agrees to provide for the personal safety of Mr. McIntosh and his family.

In Paragraph 6a of the Lease Agreement, Mr. McIntosh agreed to indemnify and hold harmless the U.S. Government for claims for loss and or damage to Mr. McIntosh's property or injury to Mr. McIntosh or his guests, which may occur as a result of the performance of the agreement. However, Paragraph 6a and 6b made it clear that nothing in Paragraph 6a relieved the U.S. Government "from any liability growing out of the negligence of its officers, agents, employees, and assigns."

In March or April 2001, a letter was sent to retiree live-aboard residents of the Marina, informing them that due to a policy giving active duty personnel priority for live-aboard status, the retirees were required to move out. Initially, the retirees were given six months or so to move out. However, this period was extended to March, 2002. Mr. McIntosh paid live-aboard fees up to March, 2002.

Mr. McIntosh and his family moved from the Marina to property Mr. McIntosh owned in Imperial Beach in early 2002. According to Mr. McIntosh, he incurred costs in connection

with moving, including $50-$60 in gasoline in connection with transporting the family's belongings and about $1,000 in rent he would have otherwise received from tenants of the Imperial Beach property.

## II. CONCLUSIONS OF LAW

The remaining causes of action against the United States are: (1) premises liability (by Sarah McIntosh); (2) negligent maintenance and security (by Sarah McIntosh); (3) negligent inflection of emotional distress (by Sarah McIntosh); (4) breach of written contract (by Louis McIntosh); and (5) breach of the implied covenant of good faith and fair dealing (by Louis McIntosh).

A. <u>Negligence Claims</u>

Sarah McIntosh's claims for negligent maintenance and security and negligent inflection of emotional distress ("negligence claims") rest on the premise that the United States breached its duty of reasonable care by (1) failing to maintain the vehicle gate and pedestrian gate in working condition so that they would close and lock; and (2) failing to provide adequate lighting in the area of the front gate.

As discussed below, the Court finds that the United States did not have a duty to provide the security measures identified above because it was not foreseeable that someone would enter the Marina and commit a violent act on a Marina resident. Furthermore, the United States did not have a duty to exercise due care in the performance of its undertaking to provide the gates and lighting because Sarah did not rely on the United States' undertaking and the United States' actions did not put Sarah at greater risk than she would have been had the United States never undertaken the measures in the first place.

Plaintiff's negligence claims also fail because Plaintiff cannot prove causation. The Court concludes that Tate was a violent predator who would have attacked Sarah even if the vehicle gate and pedestrian gate were operable and there was better lighting inside and around the vehicle gate.

### 1. Governing Law

#### a. Premises Liability

Under California law, a landlord owes tenants a general duty to take reasonable steps to secure common areas against foreseeable criminal acts of third parties. <u>Ann M. v. Pacific Plaza Shopping Center</u>, 6 Cal. 4th 666, 674 (1993). The existence of a duty is a question of law to be decided by the court. <u>Id.</u> at 678.

Factors that courts consider in determining the existence and scope of a duty in a particular case include:

> [T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

<u>Ann M.</u>, 6 Cal. 4th at 675 n. 5 (quoting <u>Rowland v. Christian</u>, 69 Cal. 2d 108, 113 (1968)). "Foreseeability and the extent of the burden to the defendant are ordinarily the crucial considerations, but in a given case one or more of the other <u>Rowland</u> factors may be determinative of the duty analysis." <u>Castaneda v. Olsher</u>, 41 Cal. 4th 1205, 1213 (2007).

When evaluating the factors of foreseeability and burden to the defendant, the foreseeability of the harm must be balanced against the burden of the duty to be imposed. <u>Ann M.</u>, 6 Cal. 4th at 678. As explained the California Supreme Court:

> Turning to the question of the scope of a landlord's duty to provide protection from foreseeable third party crime, . . . we have recognized that the scope of the duty is determined in part by balancing the foreseeability of the harm against the burden of the duty to be imposed. [Citation.] "'[I]n cases where the burden of preventing future harm is great, a high degree of foreseeability may be required. [Citation.] On the other hand, in cases where there are strong policy reasons for preventing the harm, or the harm can be prevented by simple means, a lesser degree of foreseeability may be required.' [Citation.]"

<u>Id.</u> at 678-679. When the burden of preventing future harm caused by third party criminal conduct is great, such as when the landlord's alleged duty includes the hiring of security guards, a high degree of foreseeability is required, and "the requisite degree of foreseeability rarely, if ever, can be proven in the absence of prior similar incidents of violent crime on the landowner's premises." <u>Id.</u> at 679. "By contrast, in cases in which harm can be prevented

by simple means or by imposing merely minimal burdens, only 'regular' reasonable foreseeability as opposed to heightened foreseeability is required." Delgado v. Trax Bar & Grill, 36 Cal. 4th 224, 244 n. 5 (2005).

However, even under the "regular" reasonable foreseeability standard, the lack of prior similar criminal acts may be a substantial factor in the determination of whether the criminal conduct at issue was reasonably foreseeable. In Sharon P. v. Arman, Ltd., 21 Cal. 4th 1181, 1197 (1999), the court explained that even setting aside concerns regarding the efficacy and burden of plaintiff's proposed security measures, the record simply did not establish the foreseeability of plaintiff's rape in the underground parking garage; other than robberies at a bank on the ground floor, there was no evidence of prior crimes against property or persons on the premises. Similarly, in Ericson v. Federal Express Corp., 162 Cal. App. 4th 1291, 1307 (2008), the court held that even under the "regular" reasonable foreseeability test, a nighttime assault in the parking lot was not foreseeable where there were no prior violent criminal acts on the property, and the case boiled down to a few sightings of nonthreatening transients on the property.

The California Supreme Court has endorsed the following analytical approach to evaluating the legal question of duty:

> The Court of Appeal in Vasquez accurately described the full analytical process in this way: "First, the court must determine the specific measures the plaintiff asserts the defendant should have taken to prevent the harm. This frames the issue for the court's determination by defining the scope of the duty under consideration. Second, the court must analyze how financially and socially burdensome these proposed measures would be to a landlord, which measures could range from minimally burdensome to significantly burdensome under the facts of the case. Third, the court must identify the nature of the third party conduct that the plaintiff claims could have been prevented had the landlord taken the proposed measures, and assess how foreseeable (on a continuum from a mere possibility to a reasonable probability) it was that this conduct would occur. Once the burden and foreseeability have been independently assessed, they can be compared in determining the scope of the duty the court imposes on a given defendant. The more certain the likelihood of harm, the higher the burden a court will impose on a landlord to prevent it; the less foreseeable the harm, the lower the burden a court will place on a landlord." ( Id. at p. 285, 12 Cal. Rptr. 3d 846, fns. omitted.) Again, other Rowland factors may come into play in a given case, but the balance of burdens and foreseeability is generally primary to the analysis. (Vasquez, at p. 285, fn. 10, 12 Cal. Rptr. 3d 846.)

Castaneda, 41 Cal. 4th at 1214.

To prevail on a claim of negligence, the plaintiff must not only prove that the defendant had a duty and breached that duty, but also that the breach was a proximate or legal cause of her injury. Saelzler v. Advanced Group, 400, 25 Cal. 4th 763, 772 (2001). The plaintiff must show that the defendant's act or omission was a "substantial factor" in bringing about the injury. Id. at 778. In other words, "the plaintiff must establish, by nonspeculative evidence, some actual causal link between the plaintiff's injury and the defendant's failure to provide adequate security measures." Id. at 774.

### b. Negligent Undertaking

Under the "negligent undertaking" theory of liability, "a volunteer who, having no initial duty to do so, undertakes to provide protective services to another will be found to have a duty to exercise due care in the performance of that undertaking if one of two conditions is met: either (a) the volunteer's failure to exercise such care increases the risk of harm to the other person, or (b) the other person reasonably relies upon the volunteer's undertaking and suffers injury as a result." Delgado, 36 Cal. 4th at 249. A defendant's undertaking of protective services increases the risk of harm if, as a result of his actions, the risk of harm is greater than if he had done nothing at all. See Paz v. State of California, 22 Cal. 4th 550, 560 (2000). Absent reliance, liability is not imposed where the defendant simply did not successfully alleviate a preexisting hazard. Id.

### 2. Front Gate and Pedestrian Gate

Plaintiff claims that the United States had a duty to provide a functioning locking vehicle gate and pedestrian gate to deter people who have no business at the Marina from entering the property. The Court disagrees.

Plaintiff relies on California Code of Civil Procedure § 1941.3(a)(1), which provides that a landlord of a building intended for human habitation must install and maintain an operable dead bolt lock on each main swinging entry door of a dwelling unit. However, this section applies to the main entry of a *building* and is inapplicable. Plaintiff attempts to

1  analogize the vehicle gate and pedestrian gate to the main door of a residential building.
2  However, the Court finds this analogy to be inapt.  The gate to the dock area where the
3  McIntosh family and other Marina residents resided on their vessels is more comparable to
4  the main entry door of a residential building.  The dock gate was secured by a combination
5  lock.  The vehicle gate and pedestrian gate are more akin to fences/gates enclosing an
6  apartment building's outdoor parking lot or outdoor common area.

7  Because the United States was not statutorily required to install and maintain a vehicle
8  gate and pedestrian gate at the entry of the Marina, the Court must examine whether such
9  a duty existed under principles of negligence.  As discussed above, in determining the legal
10 question of duty, the Court must balance the foreseeability of the harm against the burden
11 of the duty to be imposed.  Ann M., 6 Cal. 4th at 678.

12 The Court finds that it would have been only minimally burdensome for the United
13 States to provide an operable vehicle gate and pedestrian gate.  Although there was
14 evidence that Marina management had to rely on the vendor to perform certain repairs on
15 the vehicle gate, meaning that the repairs could take some time, Marina management knew
16 that the vehicle gate frequently broke and could have replaced it with a more reliable gate.
17 Similarly, it would not have been a significant burden for Marina Management to ensure that
18 the pedestrian gate was on its hinges and able to close and lock.  Therefore, the "regular"
19 reasonable foreseeability standard applies.

20 However, even under the "regular" reasonable foreseeability standard, the Court finds
21 that it was not foreseeable that someone would come onto the Marina and commit a violent
22 crime against a Marina resident. Other than Sarah's attack and an isolated incident involving
23 an assault by one Marina resident against another Marina resident, there was no evidence
24 that there had ever been an assault, attempted rape, rape, or other violent crime committed
25 on the premises.  There had been some thefts in the late 1990's, but there is no evidence
26 that any of the thefts involved any type of force or intimidation.  See Ericson, 162 Cal. App.
27 4th at 1306 (reasoning that prior thefts at FedEx did not make it foreseeable that an assault
28 would occur in the parking lot because, among other things, "there is no indication that any

thefts involved force, weapons or even any type of intimidation."). There is no evidence that any Marina residents ever complained about threats to their personal safety or concerns about their personal safety. [1]

Mr. McIntosh testified regarding a news item in 1983 regarding two Japanese exchange students who were shot and raped near the Marina. However, this crime did not take place on the premises and occurred eighteen years prior to Sarah's attack. Furthermore, there was no evidence that Marina management was aware of this crime. The Court notes that there is no evidence that due to the "secluded" nature of the area surrounding the Marina there was a high rate of violent crimes or other crimes. Indeed, Plaintiff herself was not concerned about being attacked when she returned home at 3:00 a.m. and did not arrange for her family members or anyone else to meet her in the parking lot.

Absent any other violent crimes on the premises, Plaintiff must rely on the general argument that absent barriers to entry of the Marina, it was foreseeable that people who had no business on the Marina could wander in and commit a violent crime. However, the Court finds that it was no more foreseeable that a violent crime would occur in the Marina than at any other public place or parking lot. As explained by the California Supreme Court: "It is difficult, if not impossible, to envision any locale open to the public where the occurrence of violent crime seems improbable." Ann M., 6 Cal. 4th at 678.

Plaintiff has failed to point to any special circumstances that made it reasonably foreseeable that someone would come into the Marina and commit a violent crime. Simply put, what happened to Sarah was totally unexpected and unforeseen. Therefore, the United States did not have a duty to install and maintain a vehicle gate and pedestrian gate at the entry of the Marina. If Plaintiff's argument were accepted, it would mean that essentially all marinas, hotels, and apartment building would be obligated to enclose their parking areas with locked gates. Such a result is not required by the law.

---

[1] In contrast, in Tan v. Arnel Management Co., 162 Cal. App. 4th 621 (2008), there were three prior violent incidents on the property, all of which took place at night and were perpetrated by a stranger on the ungated portion of the premises.

1    Plaintiff argues that even if the United States did not initially have a duty to provide
2 gates at the entry, it undertook the duty and must be held liable for the negligent performance
3 of that duty. Under California law, a defendant cannot be held liable for "negligent
4 undertaking" unless (1) the defendant's failure to exercise due care in the performance of the
5 undertaking increased the risk of harm to the person; or (2) the other person reasonably
6 relied upon the defendant's undertaking and suffered injury as a result. Here, neither of
7 these conditions has been fulfilled. Delgado, 36 Cal. 4th at 249.

8    Any failure by the United States to exercise due care in the maintenance of the vehicle
9 gate and pedestrian gate did not in and of itself *increase* the risk of harm to Sarah. By not
10 keeping the gates in working condition, the United States arguably failed to *reduce* any
11 preexisting risk of harm, but did not *increase* the risk. See Paz, 22 Cal. 4th at 560.

12    There is no evidence that Sarah relied on the United States' undertaking of the duty
13 to provide gates at the entry. According to Sarah herself, there was frequent trouble with the
14 vehicle gate and it did not surprise her that the gate would be broken. Other witnesses also
15 testified that the vehicle gate was frequently broken and left in the open position. Given
16 these facts, Sarah did not and could not have reasonably relied on the entry gates for
17 purposes of her personal safety. Therefore, Plaintiff's negligent undertaking claim fails.

18    Plaintiff's negligence claims also fail due to the lack of causation. Any failure by the
19 United States to maintain the vehicle and pedestrian gate was not a substantial factor in
20 bringing about Sarah's injury. Tate testified that he was motivated to follow Sarah because
21 the gate was open and said that "without a shadow of a doubt that had that gate not been
22 opened, I would not have followed her." However, the gate would have opened even if the
23 vehicle gate was properly functioning. Sarah would have pressed the button, and the vehicle
24 gate would have slid open. According to Tate, he followed immediately behind Sarah's car
25 on foot:

> Q. I want you to assume for the moment that if the gate was closed, the front drive-in gate was closed at the marina, and Miss McIntosh had driven her car in through the gate, opened the gate and drove through, can you see any reason that would stop you from walking through the gate right behind her car.
>
> A. If the gate was closed?

> Q. But then opened when she drove through it. Any reason why you couldn't have followed her car in?
>
> A. *That is exactly how I got in there the first time, because the gate was open when her car went in, and I followed her car right behind her.*

(Tate Dep. 68:17-69:3) (emphasis added).

Tate must have followed closely behind Sarah's car because Sarah saw Tate in the parking lot immediately after parking her car. Accordingly, even if the vehicle gate was working, Tate could and would have slipped through the gate behind Sarah's car. The Court does not believe that Tate would have been deterred from following Sarah by the possibility that the gate would close behind him, potentially leaving him with no easy exit. The Court believes that Tate saw an opportunity to rape a woman who was alone and, in his words, "just attacked." (Tate Dep. 62:23). Tate acted on violent impulse and would have attacked Sarah whether the gate was working or not. His attack was impulsive, not planned.

### 3. Lighting

Plaintiff also claims that the United States had a duty to provide adequate lighting in and around the area of the vehicle gate. Plaintiff claims that the United States should have installed additional lighting on the north (public) side of the gate and claims that the United States had a duty to keep the existing lights inside the gate in working order.

However, for the reasons discussed above, it was not reasonably foreseeable that a violent criminal act would take place on the premises. Therefore, there was no duty to provide lighting.

As for Plaintiff's negligent undertaking claim, even assuming that Sarah relied on the reasonable maintenance of the lights that were in place, the evidence does not establish that the United States breached its duty to exercise due care in the performance of its undertaking to provide and maintain lighting. There is no evidence that the Navy took an unreasonable amount of time to repair the street light inside the gate or other lights that went out. As explained by Brandon Workman, Marina management could not perform repairs on the street lights, which were high voltage. Therefore, immediate repairs of the street lights

were not possible. The street light inside of the gate was fixed within two weeks of the attack on Sarah.

Moreover, any lack of lighting was not a substantial factor in bringing about Sarah's injury. There is no evidence that Tate hid in the dark parking lot outside of the gate. The lighting around the area of the gate was bright enough that Tate could see Sarah and her car. The parking lot where Sarah parked was well-illuminated, and Sarah saw Tate before she got out of the car. There were also lights on the side of the office building where Tate followed Sarah and grabbed her. The grassy area where Tate dragged Sarah was less well-lit. However, Tate obviously was not so concerned with lighting if he followed Sarah and grabbed her in well-lit areas. Given the early morning hour, Tate probably assumed that nobody else was around. If the grassy area had been well-lit, Tate could have dragged Sarah between parked cars or someplace else that was hidden from view or dimly lit. Tate saw Sarah alone, decided to rape her, and nothing else mattered to him.[2]

B. Contract Claims

Plaintiff Louis McIntosh claims that by failing to adequately secure and maintain the Marina area, the Navy breached its contract with him.

There is no explicit provision in the Lease Agreement or Rules and Regulations of the Marina requiring the Navy to provide or maintain gates at the Marina entry or lighting. Mr. McIntosh claims that the Lease Agreement had an implied term or implied covenant of good faith and fair dealing requiring the maintenance of these security measures. Even if the Court were to assume that the Lease Agreement contained such an implied term, Plaintiff's breach of contract claim fails because Mr. McIntosh suffered no damages from the breach.

An essential element of a claim for breach of contract is damages resulting from the breach of contract. San Carlos Irrigation & Drainage Dist. v. United States, 877 F.2d 957,

---

[2] In Sharon P., 21 Cal. 4th at 1196-97, the California Supreme Court noted that a number of courts have "criticized the view that 'adequate lighting' is a simple and well-defined security measure that is effective in preventing crime-related injuries." The Court does not decide whether adequate lighting can be an effective security measure, but, rather, finds that any lack of lighting on the Marina was not a proximate or legal cause of Plaintiff's injury.

959 (Fed.Cir. 1989). Mr. McIntosh claims that he incurred expenses moving to his residence in Imperial Beach. He also claims that he lost approximately $1,000 in rent from tenants of the Imperial Beach property. However, the Court finds that Mr. McIntosh moved from Fiddler's Cove in approximately February 2002, because Marina management required the retiree live-aboards to move out by March 2002 or soon thereafter. The McIntosh family had no choice but to move as a result of the Navy's enforcement of the policy giving preference to active duty personnel who wished to live aboard their vessels. If Mr. McIntosh wanted to move out of concern for his family's safety, he would have done so shortly after Sarah's attack on August 4, 2001. Instead, he stayed at Fiddler's Cove until it was no longer an option.

Mr. McIntosh did not suffer any damages as a result of the alleged breach of contract. Therefore, he cannot prevail on his breach of contract claim.

Mr. McIntosh also raises the theory of breach of the implied warranty of habitability. To the extent that his claim for breach of the implied warranty of habitability is based on the contract, the claim fails for the same reasons as discussed above. See Fairchild v. Park, 90 Cal. App. 4th 919 (2001) (holding that tenants' claim for breach of the implied warranty of habitability was not based on a duty independent of the lease and was a contractual claim). To the extent Mr. McIntosh intends to sue in tort, Mr. McIntosh has not exhausted his administrative remedies under the Federal Tort Claims Act and cannot maintain the claim. 28 U.S.C. § 2675(a). Furthermore, given that the attack on Sarah was an unforeseeable and random event, any failure to maintain the front gates or install and maintain lighting did not render the premises unsafe for habitation.

### III. CONCLUSION

For the reasons discussed above, the Court finds in favor of the United States and against Plaintiff Sarah McIntosh on her claims for premises liability, negligent maintenance and security, and negligent infliction of emotional distress. The Court also finds in favor of the United States and against Plaintiff Louis McIntosh on his claims for breach of written

contract and breach of the implied covenant of good faith and fair dealing.  The Court **directs entry of final judgment** in favor of the United States pursuant to Fed. R. Civ. P. 54(b), because the Court finds that there is no just reason for delay.

   The Court concludes by emphasizing that the Court has no doubt as to the veracity of Sarah's account of Tate's brutal attack on her and the injuries she subsequently suffered.  Sarah went through a harrowing ordeal.  However, under controlling principles of law,  the United States cannot be held liable for Tate's criminal acts.  Tate himself must answer for what he has done to Sarah and his other victims.  It is the sincere hope of this Court that with the love and support of her family, Sarah will continue to move ahead with her life, leaving the events of August 4, 2001 further and further behind.

**IT IS SO ORDERED.**

DATED:  September 29, 2008

_____
Honorable Barry Ted Moskowitz
United States District Judge